# UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA

v.

MARLON SMITH, aka "Dread"

**CRIMINAL COMPLAINT**

CASE NUMBER: **MAGISTRATE JUDGE KEYS**

**08CR 226**

FILED
JN 3-18-08
MAR 1 8 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about February 22, 2007, in Cook County, in the Northern District of Illinois, defendant(s)

did knowingly and intentionally distribute and possess with the intent to distribute a controlled substance, namely, in excess of 50 grams of mixtures containing cocaine base in the form of crack cocaine, a Schedule II Narcotic Drug Controlled Substance;

in violation of Title 21, United States Code, Section 841(a)(1).

I further state that I am a Special Agent for the Federal Bureau of Investigation and that this complaint is based on the following facts:

**See attached affidavit**

Continued on the attached sheet and made a part hereof:  X  Yes  __ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

March 18, 2008                                at    Chicago, Illinois
Date                                                City and State

MAGISTRATE JUDGE ARLANDER KEYS             _____
Name & Title of Judicial Officer            Signature of Judicial Officer

STATE OF ILLINOIS    )
                                  ) SS
COUNTY OF COOK    )

## AFFIDAVIT

I, Jason C. Rahoy, being first duly sworn on oath, depose and state as follows:

1. I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have been so employed since July 2006, and am presently assigned to the FBI's Joint Task Force on Gangs, Chicago Field Division. In this capacity, I have received specialized training in the enforcement of federal narcotics laws. My training and experience has involved, among other things, (a) the debriefing of defendants, witnesses, and informants, as well as others who have knowledge of the distribution and transportation of controlled substances and gang-related activity; (b) surveillance; and (c) analysis of documentary and physical evidence. I have also received training and have experience in investigations involving the interception of wire communications. Based on my training and experience as a FBI agent, I am familiar with the manner in which narcotics traffickers conduct their drug-related businesses, including the methods employed by narcotics traffickers to import and distribute narcotics, their use of telephones in furtherance of their illegal activities, and their use of coded language to refer to narcotics, drug proceeds, and other aspects of narcotics trafficking.

2. I am responsible for investigating crimes that involve, among other things, the unlawful importation of illegal narcotics (21 U.S.C. §§ 952, 960 and 963), the possession

with the intent to distribute controlled substances and the distribution of controlled substances (21 U.S.C. §§ 841 and 846), the use of communication facilities to further these offenses (21 U.S.C. § 843(b)), as well as the related laundering of monetary instruments (18 U.S.C. §§ 1956 and 1957). In conducting these investigations, I have used a variety of investigative techniques and resources in several investigations which have included physical and electronic surveillance, monitoring court-authorized wiretaps, the use of confidential human sources ("CHSs") and informants, and securing other relevant information using other investigative techniques. Through these investigations, my training and experience and conversations with other Special Agents, as well as other law enforcement personnel, I have become familiar with methods used by narcotic traffickers to safeguard their narcotics, to distribute narcotics, and to collect and launder related narcotic proceeds.

3. The following information is based upon my participation in the investigation, knowledge, and information received from other law enforcement officers, local law enforcement officers, and a CHS who has proven reliable and provided information which has been independently corroborated. As a result of my participation in this investigation, I am familiar with all aspects of this investigation as described in this Affidavit. Since this Affidavit is being submitted for the limited purpose of establishing probable cause to believe that MARLON SMITH, also known as "DREAD", violated Title 21, United States Code, Section 841(a)(1), it does not include each and every fact known to me concerning this investigation.

4. Based on the information contained in this Affidavit, I submit that there is probable cause to believe that on or about February 22, 2007, MARLON SMITH knowingly and intentionally distributed a controlled substance namely, 50 grams or more of mixtures containing cocaine base in the form of crack cocaine, a Schedule II Narcotic Drug Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

## Background of the Investigation

5. The CHS is a source of information who has been providing information to the FBI for the past year.[1] The CHS is a longstanding member of the Almighty Latin King Nation ("ALKN"). The information provided by the CHS has been independently corroborated through consensual telephonic recordings, body recordings, surveillance, and information provided by independent cooperating witnesses.

6. On March 29, 2007, CHS identified SMITH from a CPD booking photograph. CHS knows SMITH as a supplier of illegal narcotics to member(s) of the ALKN. CHS related that, in the past, CHS has purchased narcotics from SMITH on multiple occasions.

---

[1] The CHS has been arrested 12 times for misdemeanor offenses and 3 times for felony offenses. CHS' arrests include domestic battery, battery, possession of illegal substances, distribution of illegal substances, criminal trespass, unlawful use of a weapon, and traffic offenses. The CHS has 1 felony conviction for delivery of cocaine. The CHS was arrested in early 2007 for possession of crack cocaine with intent to distribute. The CHS has been cooperating with law enforcement in an effort to gain a possible reduction in his/her sentence once charged. The CHS entered into the United States illegally. The CHS has received a Significant Public Benefit Parole (SPBP) so that his/her current immigration status here in the United States is legal. The FBI requested this status to enable the CHS to continue his/her cooperation with the FBI in its investigation.

**February 21, 2007 Call to MARLON SMITH Arranging Pick-Up of Narcotics**

7. On February 21, 2007, at approximately 1:50 p.m., CHS placed a consensually recorded telephone call to MARLON SMITH ("SMITH") at telephone number (773) 663-6813. During this call, CHS told SMITH that he/she would be stopping by the following morning (February 22, 2007). SMITH asked CHS, "one or two."[2] CHS responded "one."[3] According to CHS, CHS understood from prior narcotics transactions with SMITH that "one" signified one package containing 2.25 ounces of crack cocaine. In the call, CHS told SMITH "I gonna check you" (stop by to see SMITH) between 9:30 a.m. and 10:00 a.m. the next day.

**February 22, 2007, Narcotics Transaction**

8. At approximately 9:45 a.m., agents provided CHS with $1,600 in United States Currency (USC) to purchase the narcotics, and a concealed recording device and

---

[2] The identification of MARLON SMITH in this Affidavit is based upon the following: First, CHS identified SMITH by voice subsequent to the consensual recordings. Second, during a recorded conversation, CHS asked SMITH what his name was and SMITH responded, "MARLON." Third, during particular recorded calls, SMITH arranged to personally meet with CHS and that meeting was surveilled by law enforcement. SMITH was identified by law enforcement as the individual arriving at the location.

[3] The recorded conversations throughout this Affidavit have been summarized, and parentheses have been placed around language that represent my understanding, other agents' understanding, and/or the CHS' understanding of what is being said during the recordings, based on the contents and context of the conversations, my experience as a law enforcement officer, and the experience of other law enforcement officers in this investigation. In addition, language that is quoted from the recorded conversations throughout this Affidavit is based upon agents' review of the recorded conversations and agents' understanding of what is being said therein. Quoted material is not intended to be a final transcription of the audio recordings from which the quotes are taken.

transmitter. Agents searched CHS and CHS's vehicle for narcotics and currency with negative results.

9. On February 22, 2007, at approximately 9:48 a.m., at the direction of agents, CHS placed a consensually recorded telephone call to SMITH at telephone number (773) 663-6813. During this call, CHS told SMITH that he/she would arrive in ten minutes.

10. At approximately 9:54 a.m., CHS began driving to the vicinity of 6456 North Ridge Boulevard, Chicago, Illinois. CHS knew this to be SMITH's residence from prior transactions with SMITH. CHS was observed continuously by surveillance agents ("surveillance") while en route to 6456 North Ridge Boulevard.

11. At approximately 10:02 a.m., surveillance observed a white Dodge Intrepid, bearing Illinois license plate 6306948 (registered to JEFFREY C. USHER, 5940 S. Calumet, Chicago, IL 60637), parking south of the building. Surveillance saw a black male, subsequently identified as SMITH by the CHS and through an investigative stop by law enforcement, exit the Intrepid and use a key to enter a rear entrance of 6456 North Ridge Boulevard.

12. At approximately 10:04 a.m., surveillance observed CHS arrive in the vicinity of 6456 North Ridge Boulevard, Chicago, Illinois.

13. At approximately 10:12 a.m., surveillance observed CHS approach the front door and enter the building located at 6454 North Ridge Boulevard, Chicago, Illinois.

14. According to CHS, upon entering SMITH's apartment, CHS provided SMITH with $1,600 USC. SMITH then counted the money. In the audio recording, SMITH can be heard counting the money. In the audio recording, CHS asked SMITH, "money right, true?" SMITH said (UI). In the audio recording, CHS asked "he gonna be here in a minute?" and SMITH said "yeah." (According to CHS, CHS understood that SMITH did not have the narcotics yet, but that an unidentified individual was bringing the narcotics to him.)

15. According to CHS, SMITH subsequently exited the apartment through the back door, and returned approximately twenty seconds later carrying a plastic shopping bag in his hand. According to CHS, SMITH removed a black scale, a blender, two measuring cups, and a plastic bag containing suspected powder cocaine from the shopping bag. In the audio recording, CHS is heard telling SMITH, "Hey Dread, they love it the way you do it, Dread, so ... I don't think it come out less than, less than three, anything. Let's cook it up, same way." (My understanding of this conversation is that CHS is telling SMITH (a.k.a. DREAD) that his customers are pleased with the quality of SMITH's crack cocaine. CHS is referring to the practice in which SMITH takes a smaller amount of powder cocaine and creates three ounces of crack cocaine mixture.) CHS told "DREAD" that he did not know his real name and SMITH said "MARLON." CHS repeated the name - "MARLON?"

16. According to CHS, SMITH proceeded to process the powder cocaine into

crack cocaine in a cup in a microwave oven, remove the cup from the microwave oven, and give it to CHS. CHS then cut the substance into chunks, and separated it into three bags containing approximately one ounce each. The sounds of a microwave door opening and closing and the beeping associated with setting a microwave can be heard on the recording. Then, the sound of glassware being scraped can be heard on the audio recording. Shortly after, the sound of a blender can be heard in the recording. On the recording, CHS comments that it looked "white." CHS said "everybody love this shit, DREAD." Later, CHS stated, "that look good." CHS advised SMITH to "wash up everything." According to the CHS, SMITH used paper towels to clean up the mess left behind by the process of cooking the cocaine.

17. At approximately 10:41 a.m., surveillance observed CHS exit the apartment building. CHS then entered his/her vehicle and departed. Agents observed CHS continuously as they followed him/her to a predetermined meeting location.

18. At approximately 10:45 a.m., agents met CHS. CHS provided agents with one plastic bag containing three smaller plastic bags containing a yellowish, rocky substance. Agents deactivated CHS's recording device and transmitter and again searched CHS and CHS' vehicle for narcotics and currency with negative results.

19. At approximately 10:44 a.m., surveillance observed SMITH exit the apartment building. SMITH discarded a white unknown object into the trash receptacle in the alley. SMITH then entered the white Dodge Intrepid bearing Illinois license

6306948 and departed the vicinity.

20. Surveillance had the white Dodge Intrepid continuously in sight until approximately 10:54 a.m., at which time agents conducted an investigative stop on the vehicle on Wolcott Avenue. During the investigative stop, agents identified the driver of the vehicle as SMITH.

21. At approximately 10:56 a.m., agents retrieved the white unknown object SMITH had thrown into the alley trash receptacle. The object was a clear plastic bag containing white paper toweling and other plastic bags, containing suspect cocaine residue. As stated above, according to CHS, SMITH used paper towels to clean up the mess created after SMITH cooked the powder cocaine into crack cocaine.

22. The plastic bags containing suspected narcotics provided to CHS by SMITH field tested positive for the presence of cocaine, and was subsequently transported to the Drug Enforcement Administration North Central laboratory. There, it was weighed and tested positive for 86.1 grams of cocaine base.

23. Based on the foregoing, I believe there is probable cause to believe that on or about February 22, 2007, MARLON SMITH knowingly and intentionally distributed a controlled substance, namely 50 grams or more of mixtures containing cocaine base in the form of crack cocaine, a Schedule II Narcotic Drug Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

FURTHER AFFIANT SAYETH NOT.

_____
Jason C. Rahoy, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
this 18th day of March, 2008.

_____
ARLANDER KEYS
MAGISTRATE JUDGE